The next case for argument is 23-1334 Novartis v. Regeneron Pharmaceuticals. Thank you for your patience. Good morning. Please proceed. Good morning, Your Honors. May it please the Court, William J. for the appellants. This invention solved a longstanding and very difficult problem in the industry that leading companies have tried and failed to solve. The Board justified finding it all obvious anyway because based on reliance on non-prior art and failing to recognize the teaching away in the key reference, which is Boulange. So the Boulange reference, of course, disparages Stopper C, which is the stopper that the Board relied upon in the combination that invalidated all the claims. And the Board justified not treating that as a teach away primarily by looking to the notion that there is a plus or minus 4 newton range within which the prior art taught that variation was okay. That's not based on anything in the prior art. That's based on the ILEA data that is not in the prior art that is secret this very day. Well, the claim doesn't demand that the breakthrough force remain static, right? That's right. So can the claim tolerate some increase in force so long as it's below 11 newtons? But where the question is, would a skilled artisan have combined Boulange, which is not an ophthalmic reference, which is this reference teaching low silicon oil syringe with the ophthalmic invention of SIG, you absolutely would focus on the things that make such a combination undesirable. One of the things that would make a combination that involved Stopper C undesirable is the variability. But you're talking about teaching away, which is more than a kind of undesirability type thing, right? That's right. So I think the two work together, and I see these as the two layers. One is that Boulange itself disparages the Stopper C. That's without even getting to the reasons why you wouldn't use a highly variable stopper in an ophthalmic injection. But so Boulange itself disparages Stopper C as not suitable for a medical device. And the second layer is... Well, there's an answer to that. I mean, there's a response to that, which is I think this is the one because there are a lot of issues that you raise in your case. But this is the one where it doesn't really do that with respect to this particular... I don't know what the terminology is, but it's not the siliconized Stopper C that they're talking about. So there's an argument, the board adopted it, the board bought it, and you're asking us to reject their analysis on that point? Well, the basis on which the board rejected it was not just where the different disparagements are placed within table five versus table seven of the reference, but the board concluded that when a skilled artisan would look at the data in Boulange, that the variability in table five was within this supposed four Newton range. You don't get that four Newton range out of anything in Boulange. The board purported to get it from two places. One is the ILEA data, not prior art. And the second is the colloquies at deposition with two of Novartis's medical experts. And those medical experts did not testify about what the force profile of an ILEA syringe was. Is there any evidence in the record that a change of four Newtons is just intolerable? Neither side's experts testified about what a skilled artisan in 2012 would have thought a sufficient range was. Right, and so that's why I'm trying to understand why should we sit here and second guess the board when there really isn't any evidence in the record that suggests that a skilled artisan in 2012 would find an increase of four Newtons to be totally unacceptable and very, very scary. So recall that the board is relying on this four Newton point to justify looking past the disparagement in the Boulange reference itself and to say, even though this is not the stopper that Boulange recommends using, nonetheless, a skilled artisan in 2012 would look at this data and based on this four Newton range think that that's okay. But the board didn't ground that on anything in the prior art in 2012 and there's no substantial evidence supporting that. I don't recall the board making that connection between the increase in Newton for the breakthrough force from after a few months to being the basis for why it's okay to look at stopper C. Page 61, I think, is the place where it does that. The variance of 4.7 Newtons to 8.4 Newtons, and here it's discussing the variation in table five of Boulange for stopper C, is within accepted industry standards and would have been a viable option for the Posita. C, non-prior art data, and the Wolfe and Kalman depositions. And if you look at- My understanding is this entire section of the opinion is really trying to evaluate your teaching way argument. Exactly. And then they're saying, well, we're just not convinced that there's a teaching way problem based on this increase in Newtons. So I think it's the opposite, Judge Tian. I think they're saying that because the increase isn't so big based on the board's perception that variation of four is not a problem, that we don't have to worry about the disparagement in Boulange itself. But when you pull out the four Newton range and see that that's not based on any substantial evidence from the prior art from 2012, then the board's reasoning falls apart. In other words, the board doesn't have a reason. Like the board doesn't say that Boulange itself recommends or even doesn't disparage the stopper. What if we wrote the board decision differently where all these different arguments are actually separate from each other? It seems like you're integrating them all. Like the supposed disparagement because stopper C is markedly inferior to stopper B1. And the board said, well, ultimately, they're both acceptable, but just one is much superior to the other. So that's not a teaching way. And then second, when the statement in Boulange about the idea that, well, this particular stopper wouldn't be acceptable to use as a medical device, the board said, we read that particular statement in the context of non-siliconized stopper C, not the siliconized version of stopper C, which is the actual stop version that's being relied on for the combination. And then finally, for this increase in force, this is a separate teaching way argument, which ultimately wasn't proven to be a true disparagement of using stopper C because there's nothing in the record that says, please don't do this when there's an increase of four when Mr. Kohler says, you know, of the mutants. So a couple of points in response to that, because I see those not as three different things. I agree that there are two different things at work here. One is, is the force level too high to begin with? And the second, which is extremely important in the ophthalmic context is, are the forces too variable, even if they are all within some kind of low range? Is there too much variation? And both sides experts agreed that variability in the ophthalmic setting is highly dangerous because of what the muscle memory that ophthalmologists develop in giving these objections. So the initial force is much of what your question to me, you're talking about, you know, table five versus table seven, and the coding versus the, you know, the siliconization versus unsiliconized. That's about the initial force, right? But the point about variability, the boards only, the only way in which the board addressed the concern about variability in table five with the siliconized stopper that they say is the device they would use in the combination. The only way they respond to that concern about variability is A, the prior art data, and B, the more general statement that this is a level of variability that would be accepted in the industry at the time. And that does not rest on any substantial evidence. It rests on non-prior art data and on the, I think it would help if I sort of explain for a minute what the doctors testified about. The non-prior art data is sort of a bell curve, right? It is data about the ILEA break-loose forces. And if you take the extreme end of the bell curve, like the one with the lowest force in the sample of 70 and the one with the largest in the sample of 70, it's a little bit less than four newtons. But the doctors did not testify at all that they had experienced that kind of variation in their use of ILEA. They just said, generally, when I use ILEA, it seems to have consistent break-loose forces. It doesn't tell you that they've experienced kind of the low end and the high end and that the odds are that they did not. And this is, of course, all non-prior art data. Compounding that problem is the fact that the Kalman exchange that the board also relies on expressly is based on a 2022 publication called Lee about break-loose forces. Not prior art, not permissible for the board to rely on. Clarify something for me. Are you arguing that the board can never rely on non-prior art data? We're not. This court's decision in IETA, among others, makes clear that there are proper roles for non-prior art considerations. It could shed light on the level of skill in the art, for example. But what it can't be used for is what the board used it for here, which is to say, at the priority date, people in the art would have expected in an industry standard to have this level of variation. And therefore, when you look at this data, you look at it in light of that industry standard. You can't prove an industry standard by post-priority secret data. And I would like to spend just a minute on the objective indicia. But if anyone's going to ask a question about this, I certainly don't want to preempt you. Just the point we'd like to leave the court with on objective indicia is just that the board's reasoning is that there are significant unclaimed features and that, therefore, the significant commercial success of Lucentis isn't attributable to the claimed invention. And I just point the court to the fact that the claimed invention, it includes the VEGF antagonist, it includes terminal sterilization, and it includes the low break-loose forces. In other words, if you look at all of the things that the board says at page 94, all of those things go to the efficacy of the invention. In other words, they say, well, the tip cap, for example, aids in terminal sterilization. That's the point. Terminal sterilization is part of this invention. So the board's... But there's no claim construction of terminal sterilization that requires a tip cap or that requires a particular rib configuration or any of the other things that the board, I think, reasonably found to be unclaimed features. They are unclaimed, but what the board suggested is that the tip cap, for example, drove the commercial success. But the only way in which the tip cap could drive the commercial success is in achieving the terminal sterilization, and the terminal sterilization is a claimed feature. That really is the key point. The innovation is the combination of low silicone oil and terminal sterilization and the very finicky VEGF antagonist all in a prefilled syringe presentation. No one had been able to do that before. Genentech had tried extensively and failed. And these are the... But this combination, as the court said in Fox Factory, you look at whether the combination is what drove the commercial success. And here, I think, we've shown more than enough to get the presumption of nexus. I see that I'm in a rebuttal time unless the court has questions. Your Honors, may it please the court, Anish Desai for Regeneron. This is a substantial evidence appeal of a 127-page final written decision finding the 631 claims obvious. The Board's decision should be affirmed because there is substantial evidence supporting the factual determinations regarding motivation to combine, reasonable expectation of success, and secondary considerations. And I'll go straight to the points on motivation to combine and the teaching away. Importantly, Novartis does not dispute the Board's finding that a person of skill in the art would have been motivated to combine Sig and Belange in order to minimize silicon oil and reduce or avoid negative interactions at the Board's decision in Appendix 54 to 55. The focus of Novartis' position is about the stopper. Now, Sig discloses a pre-filled syringe with a stopper. All these syringes have stoppers. And the petition explained that a skilled artisan would have been motivated to combine either stopper B1 or stopper C. And there was reason to do both. And stopper C is a typical configuration that was in commercial use already. That's in the Board's decision. Stopper B1 was the invention in Belange with a newer type of coating. The Board found that the arguments and evidence regarding stopper C were sufficient and decided not to address the stopper B. Novartis' rebuttal was that there is a teaching away with respect to stopper C. Now, stopper C is not some experimental stopper. It was the commercially available benchmark by which Belange was comparing its newer stopper, B1. And at Appendix 56, the Board found that stopper C was a typical stopper configuration and was already in use in a prior art terminally sterilized pre-filled syringe that included a VEGF antagonist. So the point being here is that Novartis' arguments regarding... Where did the Board say that stopper C was already being commercially used in the terminally sterilized pre-filled syringe? That's at Appendix 56. And that goes... That's prior to them addressing this argument regarding the delta, the 8.4 newtons, and Novartis' arguments that that would be unacceptable. And the key point is that Novartis was trying to make the point that 8.4 newtons... Oh, you're talking about McCougan. Correct. And there's also other evidence that the Board cited about rubber stopper with silicon oil being a typical configuration. Was it known in the art at the time that McCougan was using stopper C? It was a syringe in public use. But we don't know if people of skill in the art knew that McCougan's product had stopper C in it. The McAgin PFS had it. McAgin? Okay. I do McAgin. There's other evidence from the experts that, for example, Appendix 6618, 6619, that's the Kohler Declaration, he testified and the Board adapted that a rubber stopper with a silicon coating was a typical prefilled syringe stopper. There's Appendix 10793, that's the deposition of Novartis' expert also acknowledging that a brimobutyl rubber stopper was a typical stopper for a prefilled syringe. And, of course, Blue Lounge itself, Appendix 3937, shows that stopper C was a commercially available stopper from West. So this was not an experimental stopper. This was the benchmark stopper that was in use. Now, it was Novartis that came forward and said, well, 8.4 newtons is unacceptable, or a delta of 4 newtons would be unacceptable, and there's a teaching away because of that. But, as Your Honor picked up, there is no evidence in the record that 8.4 newtons would be unacceptable. There is no evidence in the record that 4 newtons, a delta of 4 newtons would be unacceptable. And, in fact, the Board rejected this argument, and there was substantial evidence to support that. For example, the patents... I'm a little concerned about the reliance on the non-prior art. Could this case be affirmed if we strip out all of the non-prior art? Absolutely, Your Honor. The Board relied on other evidence, substantial evidence that 8.4 newtons would not be unacceptable. For example, the admission in the patent spec, that's at Appendix 269, that typical prefilled syringes for intravitreal injection had less than 20 newtons. And, of course... It doesn't quite say it like that, right? But the entire paragraph starts with, having too great a force required to move the stopper can cause a problem. Smooth administration of the eye is particularly important in sensitive tissues such as the eye. Break-loosen slide forces for prefilled syringes known in the art are typically less than 20 newtons. Now, of course, 8.4 newtons is well below 20 newtons, so that's the patents spec right there. But the point being, Novartis had no evidence to say that 8.4 newtons was unacceptable. They were the ones coming forward with the argument, you wouldn't use this because of the 8.4 newtons. They had the burden of production there on that point. And the non-prior art information can be used, of course, to rebut this argument. In other words, an expert comes forward and says, 8.4 newtons would be unacceptable, but it has no evidence to support that, no data to support that. And the non-prior art here, the testimony from the ophthalmologist, demonstrates that there's no basis for that argument. The Kalman depo... But Kalman wasn't saying, here's what I understood in the art back at the priority date, 2012. And back at 2012, yeah, it's okay to have... to tolerate some increase in the breakthrough force. That's not his testimony. Correct. Kalman's testimony was that he... I don't think we could say that the ILEA data, even though it's post-priority date, somehow reveals what skilled artisans knew at the time of the invention of 2012. That's correct, but that's not the purpose of that testimony or that evidence. The purpose of that testimony and that evidence is to demonstrate that Novartis' position that 8.4 newtons would be unacceptable has no basis. There is other sufficient motivations to use Stopper C, the fact that it was a commercially available and the benchmark stopper that was already in use in a terminally sterilized prefilled syringe. The purpose of the Kalman deposition, the Wolf deposition, is to demonstrate that Novartis' position, the unsupported position that 8.4 newtons would be unacceptable, has no basis. Because even today, these ophthalmologists are injecting and say, for example, Kalman testified that he uses Avacin and ILEA the most, and the ILEA syringe can require up to 10 newtons, and it varies between 3 and 10 newtons. So that is concrete evidence demonstrating that Novartis' position that 8.4 newtons would somehow be unacceptable has no basis. And of course, there is the patent spec. I think you also brought up the claim language, and I think the Board was right to consider the claim language in assessing whether an 8.4 newtons would be unacceptable, and here's the reason. It demonstrates how Novartis' position is somewhat nonsensical. Novartis says that 8.4 newtons would be unacceptable for a physician. And if we look at the claim scope, that really makes no sense, because the claims cover a PFS with a break-loose force of up to 11 newtons. There's no limitation on the break-loose force when it's measured. Is Novartis really arguing that they wrote a claim and they covered a range that they now say would be unacceptable to a physician? That absolutely makes no sense. And that's why the Board was correct to consider the claim language. It wasn't a matter of hindsight. It was a point that you are actually claiming a range that you are now arguing would be unacceptable, and that doesn't make any sense. As far as the confidential information, I think, Your Honor, I've covered that point with respect to other data. I guess getting back to the confidential markings in these briefings, I'm at the moment at a loss on how we would write an opinion, given the way so much details here have been marked confidential. Your Honor, with respect to the I think the vast majority of the redactions are in the objective indicia section, and I believe that's primarily Novartis' redactions. I believe the only redaction that we have is with respect to the data from the ILEA PFS. From what? The data from what? The ILEA PFS. The ILEA pre-filter range to force data. I believe that's the only redaction that we have. Why don't you turn to the secondary considerations? Yes. Now, with respect to secondary considerations, the law is clear that commercial success, if it's due to an unclaimed feature of the device or if the feature that creates commercial success was known in a prior art, the success is not pertinent. Now, the Board rejected Novartis' position that the Lucentis PFS is coextensive with the claim. That was at Appendix 75 to 80. They cited substantial evidence of significant unclaimed features of the Lucentis PFS, and I think importantly, the Board also pointed out the claims are far broader than the Lucentis PFS and encompass embodiments that would not be commercially successful. For example, I think my friend mentioned that the claims cover the VEGF antagonists, but they cover VEGF antagonists that have not been successful. This is covered in the Board's opinion in Appendix 80 to 81. The Board also addressed the number of features... How many antagonists are covered by this claim? Any anti-VEGF antagonist, and in fact, there is one specifically that's mentioned in the decision that would be covered by this, and in fact, Novartis used that syringe, which is a different... It's not Lucentis PFS, it's a different drug. They used that as their domestic industry product in the ITC case, and that... Let's say there were 40 different antagonists covered by this claim. Novartis wouldn't have to prove commercial success for all 40 in order to get the presumption of nexus, would it? Well, I think to show coextensiveness, if their claim specifically covers a product that has been shown to be absolutely unsuccessful, I think that's a very big problem, and that is the case here. I'm asking a different question. Theoretically, they have one really good commercial... commercially successful environment, one particular active ingredient, one particular antagonist, but the claim is broad enough that it covers 39 others. To what extent, in order to be granted the presumption of nexus, would Novartis have to somehow convince a fact-finder that the other 39, even though they're not in commerce, would also enjoy the same level of commercial success? I believe they would... I think that's a problem if you have a claim that is far broader than your commercial product and includes things that you would have to demonstrate some level of connection between all those other items and the success, but that's not the only point with this claim. The board also found that Novartis argued that it would be safer and more convenient, and they found that the safety was about the very low silicon oil content in the Lucentis PFS, which is redacted in the briefs, so I cannot say that amount, but it is far lower. The actual amount in the claim in the product is far lower than the range that's claimed, and the board actually found and pointed out that the range that's claimed includes amounts that would have been unsuccessful, that admittedly would have been unsuccessful in the Lucentis PFS. So again, that's another problem with the claim not being coextensive and not lining up with the actual product. And then there was a host of other items that Novartis acknowledged were unique and necessary to achieve the terminal sterilization. Again, those are all redacted in the briefs, but those are not claimed. And then the last point with respect to the low silicon oil and terminal sterilization, again, terminal sterilization and low silicon oil amounts are features of the prior art. And again, go back to the case law that says if the features that create commercial success were known in the prior art, the success is not pertinent. The board made factual findings that low silicon oil and terminal sterilization are features of the prior art. Genentech couldn't figure this out, and then it had to take a license on this patent. And then the product is not gangbusters. So, Your Honor, with respect to Genentech and the license, the board made a number of findings with respect to that license, all of which are redacted in the brief. But the bottom line with that license is that it covered a far substantial more amount than the patent itself. And those are set forth in the board's decision in Appendix 98 to 99. So there's really no way for Novartis to establish a nexus with respect to the license. And with respect to Genentech's failure and the long-felt need issue, Novartis itself framed the issue as a syringe, the need that was not met was a syringe with low levels of silicon oil to prevent silicon oil injection in the eye. That's at Appendix 96. But the board found that the claims do not actually meet that need, as they only pertain to the amount of silicon oil applied to the barrel, and do not prevent silicon oil from being introduced via the stopper or the filling process. That's at Appendix 96. The board also found that whether silicon oil migrates into the eye is a question of the process that's used to apply the silicon oil, which is also not claimed. For example, the claims do not require baked-on siliconization, which is the prior art process that reduces the amount of free silicon oil on the barrel. That's also at Appendix 96 and 97. And with respect to Genentech, the board did find that the project was abandoned due to degradation of the VEGF antagonist, but also found that that did not necessarily translate to a failure to reduce silicon oil levels. So there was not a connection between what Novartis was arguing was the long-felt need and their claims as well as Genentech's failure. And that was at Appendix 96. So your argument is that if there's any of the elements that existed in the prior art, that that's an impediment towards commercial success. Well, the precise language of the law is that if the feature that creates commercial success was known in the prior art, that success is not pertinent. That's a quote from the Ethicon case, 812 F3rd 1034. And there is no... There are factual findings that were made that low silicon oil... What about rearranging some of these features that are known in the prior art? And now you... You know, before it was A, B, C, D, and now you rearrange them as F, G, Z, F, and that leads to commercial success. In your view, you couldn't have commercial success in that situation. Well, I don't agree with that, Your Honor. I respectfully disagree. I think that there could be situations where you're rearranging the part and changing the puzzle pieces in a way that could do that for you. Isn't that what your friend on the other side's arguing? That's what he's arguing, but I would submit that that's not the situation here. There is no rearranging of terminal sterilization and low silicon oil. But the fact that there's elements that existed in the prior art, that's not... That does not necessarily mean that you cannot have commercial success, right? That's correct, but in this situation, a terminally sterilized pre-filled syringe containing a VEGF antagonist was already on the market. The inventors here did not contribute terminal sterilization to the art. The inventors also did not contribute a low silicon oil syringe. The board made that finding because the inventors did not bring forward baked-on siliconization. They did not actually claim a syringe that had a low silicon amount because they only claimed the amount on the barrel and did not place any limitation on the amount of silicon oil applied to the stopper. You're arguing that their claimed advance existed in the prior art. Absolutely, Your Honor. So in a way, there's nothing new there, so you can't have commercial success. That's attributable to the claimed invention. What explains the sharp rise in sales and things of that nature? First of all, the drug product is paramount. It is clear, and it was found, that there are... The convenience of a pre-filled syringe is an advantage. But Novartis and this invention did not bring forward the convenience of a pre-filled syringe because pre-filled syringes already existed, including one with a VEGF antagonist. So certainly the convenience increases the sales, but that is not something that Novartis contributed. Thank you, Your Honor. Thank you. We'll give you an extra two minutes to even it out. Oh, thank you, Your Honor. I just have four points, and the first one actually ties together where my friend left off about the combination and actually also the point about Stopper C being in the prior art. He relied heavily on the idea that Becton Dickinson was using Stopper C in Macugen. That's refuted at page 92 of the Board's decision. I urge the Court to just look at that one page, which is in the Objective-Initiate discussion, but it discusses exactly why Macugen did not achieve the success of the invention. Macugen didn't achieve the low silicon oil part of the combination. So the idea that Stopper C is in the prior art and already known to be usable for these purposes. Remember that Boulange is about low siliconization, and the problem is Stopper C, Boulange itself says, is markedly inferior. Part of the reason for that is variability. That's my second point. On variability, you've got a number of questions for my friend about the disparagement and whether the Board's reliance on prior art affected its decision or whether it could be sustained on other grounds. The main thing that he pointed to was the statement in column 5 of the specification about 20 newtons. That doesn't say anything about variability. So even if you take it as they take it, which we disagree with, we don't think it's talking about in the ophthalmic context at all because there are many pre-filled syringes for many other uses. But that says nothing about variability. Just to compound the problem with reliance on the non-prior art data, in answering your questions, my friend relied on the testimony of Dr. Kalman. What was Dr. Kalman testifying about? Non-prior art, Lee article from 2022. This is at page 10938 to 39 of the appendix. That's the 10 newton figure that he cited to you from the non-prior art article. The last point is just about the objective indicia. Lucentis indisputably practices the claims. That's not disputed. The answer to your question, Judge Chen, about whether you have to show that every single species within the genus would be commercially successful, squarely rejected by Teva versus Eli Lilly, 8F4 at page 1362. We didn't cite that in our papers because the other side did not defend this particular finding. Is that a presumption of nexus case? It is. It says we can't imagine that if you have a commercially successful species and a claim to the entire genus, we can't imagine that you wouldn't get a presumption of nexus in that case. That wound up being a functional claiming case and the court didn't apply the presumption in that case. In this case, we're talking about the species of Vegevantagonist, which is a recognized set of products being used for this purpose. What about the one species that the other side brought up that wasn't particularly good? That's a bay of view. My response to that is we're looking at the combination. The fact that one Vegevantagonist may be more successful than another, that doesn't disparage the... Maybe I shouldn't use that word. That doesn't undermine the point that the pre-filled syringe presentation of a Vegevantagonist leads to more commercial success. In other words, when you take a Vegevantagonist and put it in a pre-filled syringe presentation, that can improve the results, just like the results that we depicted in our brief for Lucentis, where the sales had been going down, the pre-filled syringe presentation becomes available, and the total sales go up. I guess the idea is if you take an old drug that's in a vial and then you put it in a pre-filled syringe, and then people buy a lot of that old product that's now in the pre-filled syringe because people really like the convenience of having just a pre-filled syringe, we're going to give a patent out every single time for something like that? Because all of a sudden people are buying a lot more of the pre-filled syringe than they were of the vial itself. When achieving that pre-filled syringe presentation means tackling and solving the most vexing problem in the industry. How do you achieve terminal sterilization and low silicone oil for this ophthalmic product, which is itself extremely finicky? Genentech tried to solve that problem and failed. So we're not saying that anything that leads to convenience is itself, you know, like that's going to be enough for the nexus. The problem is now where what achieves the convenience is the PFS presentation, and where what makes the PFS presentation possible is the combination of elements that only the patent owners have achieved. That is commercial success. That is nexus, and that's not obvious. Thank you.